UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

AMIGO SHUTTLE INC. and MICHAEL H.
CONNERY, JR.

        Plaintiffs,

    v.

THE PORT AUTHORITY OF NEW YORK AND
NEW JERSEY, KEW T. FLYER INC.,
CHRISTINA CONTUMELIO, SUSAN WARNER
DOOLEY, AMY FISHER, and SHERIEN
KHELLA,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Civil Action No. _:__-cv-_____ (___)

**ECF Case**

**<u>COMPLAINT</u>**

**<u>JURY TRIAL DEMANDED</u>**

   Plaintiffs Amigo Shuttle Inc. ("**Amigo**") and Michael H. Connery, Jr., by and through

their attorneys at Valli Kane & Vagnini LLP, bring this action for compensatory damages, treble

damages, attorneys' fees, injunctive relief, and other legal and equitable relief from the Port

Authority of New York and New Jersey, Kew T. Flyer Inc., Christina Contumelio, Susan

Warner-Dooley, Amy Fisher, and Sherien Khella (collectively, "**Defendants**") for: unlawful

restriction of trade under federal law and state law, including, without limitation, the Sherman

Act of 1890, 15 U.S.C. §§ 1-2, the Clayton Act, 15 U.S.C. §4, the "Donnelly Act" (New York

General Business Law §§ 340-347); tortious activity under New York law, including without

limitation Tortious Interference With Contract, and Tortious Interference With Prospective

Economic Advantage; and pursuant to any other cause(s) of action that can be established based

upon the factual allegations set forth herein.  Plaintiffs allege as follows:

## INTRODUCTION

1.      By this action, Plaintiffs seek, inter alia, compensatory damages, treble damages and prospective equitable relief to stop a scheme concocted by Defendants to unlawfully restrict shuttle bus competition at Port Authority Airport Terminal Number 4 ("Terminal 4"), Terminal Number 5 ("Terminal 5"), and prospectively all remaining and future airline terminals of John F. Kennedy International Airport ("JFK") and all other Port Authority controlled airports. and the resulting anticompetitive injury to Plaintiffs' business or property, including, without limitation, lost sales and profits due to Plaintiffs' inability to participate in the market because of Defendants' exclusionary conduct.

## JURISDICTION AND VENUE

2.      This court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States including, without limitation, the Sherman Act of 1890, 15 U.S.C. §§ 1-2, and the Clayton Act, 15 U.S.C. §4.

3.      This Court also has jurisdiction over this action pursuant to the Declaratory Judgment Statute, 28 U.S.C. § 2201.

4.      The Court's supplemental jurisdiction is invoked pursuant to 28 U.S.C. § 1367 (a), which confers supplemental jurisdiction over all non-federal claims arising from a common nucleus of operative facts such that they form part of the same case or controversy under Article III of the United States Constitution.

5.       Venue is proper in this Court pursuant to 29 U.S.C. §§ 201-219, in as much as this judicial district lies in a State in which the unlawful employment practices occurred.  Venue

is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (c), in that Defendants each availed themselves of this jurisdiction by conduct business in this district.

**PARTIES**

6.      Plaintiff Amigo Shuttle Inc. is a corporation organized under New York Business Corporation Law §402, with New York Department of State Registration Number 5865241, registered to plaintiff Michael H. Connery Jr., having a principal place of business at 100-12 157th Ave, Howard Beach, New York 11414.

7.      Plaintiff Michael H. Connery, Jr. is a Florida citizen residing at 10244 Kristen Park Dr., Orlando, FL, 32832.

8.      Defendant Port Authority of New York and New Jersey (the "Port Authority") is, and at all relevant times has been a body corporate and politic created by Compact between the States of New York and New Jersey with the consent of Congress of the United States of America, having an office at 225 Park Avenue South, New York, New York.

9.      Defendant Kew T. Flyer Inc. ("**KTF**") is a corporation organized under New York Business Corporation Law §402, with New York Department of State Registration Number 5814164, registered to defendant Christina Contumelio, with an "active" status, and an address registered as 119-51 Metropolitan Ave, 2E, Kew Gardens, New York 11415.

10.      Upon information and belief, Defendant Christina Contumelio is a New York resident.

11.      Upon information and belief, Defendant Susan Warner Dooley is a New York resident and has been, at all relevant times, a senior executive for defendant the Port Authority, including in roles as General Counsel and Chief Financial officer.

12.     Upon information and belief, Defendant Amy Fisher is a New York resident and has been, at all relevant times, First Deputy General Counsel for defendant Port Authority.

13.     Upon information and belief, Defendant is a New York resident and has been, at all relevant times, employed by the Port Authority in the job titles of Deputy Aviation Commercial Officer, and, since March 2022, Treasurer.

## ADMINISTRATIVE EXHAUSTION

14.     Plaintiffs exhausted their administrative remedies by serving a Notice of Claim upon the Port Authority at their offices at 4 World Trade Centre, 150 Greenwich Street, New York, NY 10007 and more than sixty (60) days have elapsed since service was completed.

## FACTUAL ALLEGATIONS

15.     Plaintiff Michael H. Connery, Jr. ("**Captain Connery**") is an airplane pilot, employed by JetBlue Airways ("JetBlue") as a Captain.

16.     JetBlue leases commercial real estate at JFK Terminal 5 from the Port Authority.

17.     On or about October 26, 2020, Captain Connery incorporated a shuttle business named Amigo Shuttle Inc. ("**Amigo**") to transport flight crew members between their lodging and residences in New York and Queens, and JFK Terminal 5.

18.     The inspiration for Captain Connery's new business was JetBlue's cancellation of its contract with Golden Touch Transportation ("**Golden Touch**"), after nineteen (19) years, during which Golden Touch had been in the same business of transporting flight crews arriving and departing at JFK Terminal 5 without interference by the Port Authority.

19.     Upon information and belief, Golden Touch's contract was active for a nineteen (19) year period and was effectively cancelled by JetBlue after Golden Touch experienced legal issues with the Port Authority at JFK.

20.     Upon learning that JetBlue had ended Golden Touch's contract, Captain Connery approached JetBlue and provided it with a business plan in order to seek JetBlue's permission to transport flight crews between JFK Terminal 5, and their lodgings and residences throughout New York and New Jersey.

21.     An Airline Arranged Permit from the Port Authority is required in order for a commercial shuttle company to pick up and drop off passengers at JFK Terminal 5, along with all other airline terminals at JFK.

22.     An Airline Arranged Permit allows a commercial shuttle operator to go to any JFK airline terminal Arrivals and/or Departures level as designated by the airline requesting or granting access.

23.     The Port Authority's policies, practices and procedures require that a transportation company obtain the sponsorship of a commercial airline, such as JetBlue, in order to obtain an Airline Arranged Permit to pick up and drop off passengers at the JFK terminal at JFK requested by the sponsoring airline.

24.     During the first half of 2021, JetBlue approved Captain Connery's request for their sponsorship of Amigo's application to the Port Authority for an Airline Arranged Permit to pick up and drop off passengers at JFK Terminal 5.

25.     Amigo and JetBlue entered into a contract pursuant to which Amigo would transport JetBlue employees between JFK, Terminal 5, and their destinations in New York and New Jersey.

26.     Upon receiving a letter of sponsorship from JetBlue, Captain Connery applied to the Port Authority for an Airline Arranged Permit on behalf of his company, Amigo.

27.    Captain Connery placed orders for two shuttle vehicles, and obtained all necessary and appropriate insurance coverage for Amigo to operate at JFK Terminal 5.

28.    While Captain Connery's application to the Port Authority for an Airline Arranged Permit for Amigo was still pending, defendant Christina Contumelio ("**Defendant Contumelio**") set up a competing shuttle business, Kew T. Flyer Inc. ("**KTF**"), , beginning approximately in November of 2020.

29.    Defendant Contumelio works at JetBlue as a flight attendant.

30.    Defendant Contumelio started operating KTF with an 11-passenger vehicle, not including driver, requiring a minimum $1.5 Million of General Liability insurance policy coverage per the Port Authority, transporting flight crews primarily between Kew Gardens and JFK Terminal 5.  Subsequently, KTF replaced the 11-passenger vehicle, not including driver, with a 24-passenger vehicle, not including driver, modified to an 18-passenger vehicle, not including driver, after the removal of 6 seats, requiring a minimum $5 Million of General Liability insurance policy coverage per the Port Authority given that the vehicle fell into the High Occupancy Vehicle (HOV) category.

31.    An operator of a vehicle with more than 14 seats, not including driver, is required to have a minimum o five-million dollar ($5,000,000.00) ("**5MM**") General Liability insurance policy per the Port Authority and per the USDOT, which supersedes NYSDOT insurance requirements Upon information and belief, Defendant Contumelio operated her modified 24-passenger vehicle, not including driver, without the minimum 5MM requisite General Liability insurance policy for ten months (11/2021 - 8/20/2022).

32.    In contrast, Captain Connery's company Amigo proposed operating smaller, 14-passenger vehicles, not including driver, which only required a minimum one-and-a-half million

dollar ($1,500,000.00) ("**1.5MM**") General Liability insurance policy coverage per the Port Authority and per the USDOT, which supersedes NYSDOT insurance requirements

33.    Defendant Contumelio's operation of KTF commenced without the required Airline Arranged Permit from the Port Authority.

34.    Upon information and belief, Defendant Contumelio and KTF never received sponsorship, unless influenced by Defendant Dooley. Defendant Fisher, or Defendant Khella, from JetBlue or any other airline as a prerequisite to obtain an Airline Arranged Permit.

35.    On or around August 2021, Defendant Contumelio's KTF was shut down by the Port Authority police with the assistance of JetBlue.

36.    On information and belief, Defendant Contumelio's KTF was shut down by the Port Authority police because JetBlue complained that KTF was operating without their permission and without a Port Authority Airline Arranged Permit.

37.    Upon information and belief, Defendant Contumelio and KTF have never received an appropriately processed and executed Airline Arranged Permit authorizing pick up and drop off of passengers at JFK Terminal 4 or JFK Terminal 5 or any other Port Authority facility or terminal.

38.    Despite being shut down by the Port Authority police, KTF has been allowed by Defendant Warner-Dooley, Defendant Fisher, and Defendant Khella, beginning on April 15th, 2022, to continue operating at JFK Terminal 5 without an appropriately processed and executed Airline Arranged Permit, and/or without properly executed License Agreement from JetBlue.

39.    Upon information and belief, Defendant Dooley and Defendant Fisher signed and issued an Airline Arranged Permit for KTF on April 2, 2022, before KTF received a countersigned JetBlue License Agreement.  This is in violation of Port Authority Policy, that a

permit cannot be approved until after all permit requirements, including insurance, license, and contract requirements have been met.

40.    Upon information and belief, KTF was issued an Airline Arranged Permit on April 2, 2022 with an expired insurance policy.

41.    Upon information and belief, KTF was issued an Airline Arranged Permit on April 2, 2022 without a countersigned JetBlue License Agreement.

42.    By issuing an Airline Arranged Permit to KTF prior to receiving a countersigned JetBlue License Agreement, Defendant Dooley and Defendant Fisher have effectively allowed KTF to operate on JetBlue's property without JetBlue's permission.

43.    Defendant Dooley and Defendant Fisher signed and issued an Airline Arranged permit for KTF before receiving a countersigned JetBlue License Agreement, in violation of Port Authority policy and the JetBlue License Agreement.    However, Defendant Dooley and Defendant Fisher did not provide Amigo with an Airline Arranged Permit after Amigo had submitted all permit requirements, including insurance and a JetBlue Permission Letter dated December 30th, 2020.

44.    On information and belief, Defendant Fisher has never signed a transportation permit at the Port Authority with the exception of KTF, demonstrating bias in favor of KTF.

45.    On information and belief, Defendant Fisher did not sign a single one of the more than 500 Port Authority transportation permits issued in 2021, demonstrating bias in favor of KTF.

46.    On information and belief, every transportation permit must be reviewed by the Port Authority Risk Department, which reports to Defendant Sherien Khella.  The Port Authority

Risk Department has not reviewed, nor can it locate, the file for KTF. This demonstrates biased interference by Defendant Khella to promote KTF.

47.     On information and belief, the Port Authority Risk Department maintains that it has never received, reviewed, or approved any application for KTF, and that KTF is operating without the Port Authority required 5MM General Liability insurance policy.

48.     On information and belief, Defendant Dooley, Defendant Fisher, and Defendant Khella are allowing KTF to operate with a $2 Million insurance policy, when a minimum 5MM General Liability insurance policy is required by the Port Authority for a vehicle with more than 14 seats, not including driver, under any circumstance.

49.     Per the Port Authority, no operator is allowed to operate at any JFK terminal Arrivals or Departures levels without at a minimum 5MM General Liability insurance policy while using a vehicle with more than 14 seats, not including driver.

50.     Under pressure from Defendant Warner-Dooley, Defendant Fisher, and Defendant Khella, the JetBlue License Agreement was issued to KTF *after* the company resumed operations on April 15, 2022, without JetBlue receiving the required 10 days' notice prior to the first day of operations, without JetBlue receiving proof of the required minimum 5MM auto-insurance policy (JetBlue requirement vs. Port Authority requirement of 5MM General Liability), and without JetBlue receiving a copy of an appropriately processed and executed Port Authority Airline Arranged Permit prior to commencing operations.

51.     Despite being shut down by the Port Authority police, KTF has been allowed by Defendant Warner-Dooley, Defendant Fisher, and Defendant Khella to continue operating at JFK Terminal 4 without an appropriately processed and executed Port Authority Airline Arranged Permit. Defendant Warner-Dooley, Defendant Fisher, and Defendant Khella used the

JFK redevelopment project to pressure Duane Siguenza ("Mr. Siguenza") at Delta into signing a License Agreement with KTF, after Mr. Siguenza initially voiced his unwillingness to do so. Neither Mr. Siguenza nor Delta had requested the services of KTF prior to, or after, being contacted by the Defendants.

52.     On information and belief, prior to KTF being shut down by the Port Authority Police, JFK Terminal 4 complained to Patrice James ("Ms. James"), Principal Property Representative, Port Authority, that KTF was operating without permission, and requested that KTF be removed.

53.     On information and belief, Defendant Warner-Dooley, Defendant Fisher, and Defendant Khella made false statements to the Port Authority police and to JFK Operations to the effect that KTF had been issued an appropriately processed and executed Port Authority Airline Arranged Permit, and should be allowed to operate.

54.     While Defendant Contumelio's KTF was operating unlawfully, Captain Connery contacted the Port Authority to inquire why his competitor was apparently being allowed to operate without an Airline Arranged Permit, and to request approval of his own Airline Arranged Permit based on Port Authority Agreement Number AXA-422.

55.     The Port Authority permitting process was managed and supervised by Ms. James.

56.     On or about August 30th, 2021, Ms. James, after speaking with Kevin Costello ("Mr. Costello"), Director of Properties and Development at JetBlue, informed Captain Connery that he could begin operating because his Airline Arranged Permit was slated for approval.

57.     Ms. James provided Amigo with Agreement Number AXA-422, indicating that Amigo had submitted all documentation required by the Port Authority, that the Port Authority

had verified the information – including proof of insurance - and that an Airline Arranged Permit was approved for issuance.

58.    Upon information and belief, Defendant Khella instructed Ms. James to issue an Airline Arranged Permit to KTF, but Ms. James refused to issue such a permit in violation of the Port Authority's policies, practices, and procedures which required commercial airline sponsorship and proof of insurance, which KTF did not have.

59.    In retaliation, Defendant Warner-Dooley, Defendant Fisher, and Defendant Khella filed a complaint with the Port Authority against Ms. James for false and unrelated work issues, knowing that Ms. James would be sent home without pay pending an investigative hearing.   Removing Ms. James was the only way for Defendant Warner-Dooley, Defendant Fisher, and Defendant Khella to advance their agenda for KTF, which has been done by Ms. Michele Delgado, Manager, Ground Transportation, Aviation Department at the Port Authority - the replacement for Ms. James.

60.    Upon information and belief, Defendant Khella instructed Ms. James that she did not want Amigo to be able to operate at JFK Terminal 5, and not to issue an Airline Arranged Permit to Amigo despite the fact that Amigo had satisfied all of the Port Authority's requirements for the issuance of an Airline Arranged Permit, and despite the fact that the Port Authority was required to do so based on the contract agreed upon between Amigo and JetBlue.

61.    On or about September 1st, 2021, Defendant Khella, who is currently employed by the Port Authority as Treasurer (and who was formerly the Port Authority's Deputy Aviation Commercial Officer), emailed Captain Connery to inform him that he and Amigo were forbidden to start operating at JFK Terminal 5.

62.    Captain Connery asked Defendant Khella why he could not begin operations and received a response from Defendant Khella to the effect that the transportation route he sought belonged to the Port Authority, when in fact this was a private route negotiated between Amigo and JetBlue, as it had been for nineteen (19) years between Golden Touch and JetBlue.

63.    Upon information and belief, the Port Authority never owned this route, which was never identified, established, or put out for public bid by the Port Authority.  In fact, Defendant Warner-Dooley, Defendant Fisher, and Defendant Khella had not been aware of the route until their "sponsorship" of KTF and interference with Amigo.

64.    Upon information and belief, the Port Authority's policies, practices and procedures require it to be completely impartial with respect to procurement of third party goods and services, including transportation services such as Amigo and KTF.  The Port Authority and its employees are required to act impartially and not to interfere in competition between such third parties.

65.    On information and belief, KTF hired an attorney and lobbyist, Bradford J. Sussman ("Mr. Sussman"), to lobby Defendant Warner-Dooley, Defendant Fisher, and Defendant Khella on behalf of KTF.

66.    In violation of the aforementioned policies, practices, and procedures, Defendant Khella contacted Mr. Costello and Lisa Reifer ("Ms. Reifer"), Director & Corporate Counsel at JetBlue, concerning Captain Connery's application for an Airline-Arranged Permit on behalf of Amigo.

67.    Mr. Costello told Captain Connery that he did not think KTF should be allowed to operate based on previous illegal activity and unethical behavior.  Ms. Reifer told Mr. Connery that "Amigo had done everything right" and that "KTF had done everything wrong."

Notwithstanding, Ms. Reifer was pressured by Defendant Warner-Dooley, Defendant Fisher, and Defendant Khella to allow KTF to operate based on their false claim of "fairness," despite the fact that JetBlue's proprietary lease allows the airline to enter into any arrangement it chooses without interference from the Port Authority.

68.    Jim Smith ("Mr. Smith"), Vice President Corporate Real Estate/Airport Development at Breeze Airways, is a former employee of JetBlue. Mr. Smith hired Ms. Reifer as an intern at JetBlue several years ago.  As a courtesy to Captain Connery, Mr. Smith contacted Mr. Costello and/or Ms. Reifer to discuss the matter at hand.  Mr. Smith told Captain Connery that Mr. Costello and/or Ms. Reifer confirmed the allegations made by Captain Connery against KTF. Furthermore, Mr. Costello and/or Ms. Reifer commented to Mr. Smith that "they were under a lot of political pressure' to allow KTF to operate.

69.    Upon information and belief, Defendant Khella contacted JetBlue with the intent to interfere with the contractual relations between Amigo and JetBlue, and prospective economic advantage of Captain Connery and Amigo of having access to drop off and pick up transportation customers from JFK Terminal 5.

70.    Upon information and belief, Defendant Khella complained to Mr. Costello that it was unfair that JetBlue had sponsored only Amigo for an Airline Arranged Permit and had not also sponsored KTF, which constitutes business interference and against Port Authority policy.

71.    Upon information and belief, Mr. Costello explained to Defendant Khella that JetBlue had no interest in working with KTF because she had operated illegally without JetBlue's permission, demonstrating a lack of integrity.

72.    Upon information and belief, Defendant Khella was not satisfied with JetBlue's response, and told Mr. Costello that she wanted to create a new transportation "Pilot Program"

for JFK Terminal 5, pursuant to which transportation services would pick up and drop off passengers in the Yellow Parking Lot instead of at JFK Terminal 5, purportedly to alleviate congestion at JFK Terminal 5.

73.    The Pilot Program created by Defendant Khella circumvented the need for KTF to acquire permission from JetBlue to operate at JFK Terminal 5.  Moreover, JetBlue was never informed that KTF was included in the Pilot Program until Mr. Costello was made aware of this fact by Captain Connery, who had been made aware in writing by Defendant Sherien Khella.

74.    Upon information and belief, Mr. Costello told Defendant Khella that JetBlue did not want the "Pilot Program" to be implemented because, among other reasons, that would be less convenient for the JetBlue's staff, because it would require them to walk (with luggage) from the arrivals/departures areas to the Yellow Parking Lot.

75.    Upon information and belief, after Mr. Costello informed Defendant Khella that JetBlue would award Amigo a contract in lieu of the Pilot Program, Defendant Khella told Mr. Costello that this was not allowed because it was a "Port Authority" route.  This was a false statement, and a direct violation of JetBlue's proprietary lease allowing the airline to choose whom it does business with.

76.    Upon information and belief, Defendant Khella concocted the putative "Pilot Program" as a means to ensure that KTF would have access to JFK Terminal 5 notwithstanding the fact that KTF could not satisfy the Port Authority's requirements for obtaining an airline sponsorship from JetBlue that is required for issuance of an Airline Arranged Permit, and that Ms. James was unwilling to issue such a permit in contravention of Port Authority policy.

77. Upon information and belief, the "Pilot Program" was drafted by Defendant Fisher, the Port Authority's First Deputy General Counsel, at the direction of Defendant Warner-Dooley and Defendant Khella.

78. Upon information and belief, Defendant Fisher also drafted a proposed contract for KTF to provide transportation services to Delta Airlines ("**Delta**") at JFK Terminal 4, in violation of Port Authority's policies, practices and procedures requiring impartiality with respect to the procurement of services, and at the request of Defendant Warner-Dooley and Defendant Khella.

79. Despite Defendant Khella's previously articulated concerns about "fairness," the Port Authority did not respond to requests from Captain Connery and Amigo for assistance in obtaining a transportation contract with Delta.

80. Upon information and belief, Defendant Warner-Dooley, the Port Authority's Aviation Chief Commercial Officer, took the proposed contract to Delta officials in both New York City and Atlanta, Georgia, including without limitation Duane Siguenza, and used the JFK redevelopment project to pressure Delta to enter into the agreement with KTF.

81. Upon information and belief, Delta had no interest in entering into a contract with KTF, and had not requested the services of KTF prior to, or after, being contacted by the Defendants.

82. Upon information and belief, Defendant Warner-Dooley attempted to pressure and coerce both JetBlue and Delta to enter into a contract with KTF, using the anticipated multi-billion dollar JFK redevelopment at JFK as leverage.

83.    On or about October 18th, 2021, Captain Connery complained to the Port Authority's Chief Executive Officer, Mr. Richard ("Rick") Cotton, about the Port Authority's interference with his contract with JetBlue and with his operation at JFK Terminal 5.

84.    On or about February 7th, 2022, Captain Connery sent correspondence to the Port Authority's Board of Directors alleging that there was unlawful corruption in its procurement and permitting process.

85.    On or about March, 2022, Defendant Fisher and Defendant Khella participated in a telephone conference attended by Captain Connery, Amigo's outside attorney Daniel Bach, Mr. Costello, JetBlue attorney Renee Anckner, and JetBlue attorney Grecia Sosa.  Participation in this call constituted business interference by the Port Authority.  During the call, Defendant Khella stated that the Port Authority was imposing a new condition, not imposed on any other Airline Arranged permittee, on issuing an Airline Arranged Permit to Amigo, which was that Amigo would have to prove it had a New York State Department of Transportation number ("**DOT Number**").

86.    Upon information and belief, Defendant Fisher and Defendant Khella were aware of the DOT protest brought against Captain Connery by Defendant Contumelio, and conspired to use the pending outcome, being influenced by Defendant Fisher, to delay or prohibit Amigo from commencing operations

87.    Upon information and belief, the Port Authority has never required a DOT Number in connection with the issuance of any other permit, including without limitation any Airline Arranged Permit.

88.    Upon information and belief, with the exception of Amigo, neither the Port Authority nor Defendant Warner-Dooley, Defendant Fisher, or Defendant Khella has ever

contacted the DOT concerning the application status of a current or potential Port Authority permittee.

89.    Upon information and belief, the Port Authority has no legal right to regulate how outside transportation services register their vehicles with the New York State Department of Transportation.

90.    Upon information and belief, the Defendants, and possibly one or more Port Authority Board members, are using their unethical relationships with the NYSDOT to harass and eliminate potential competitors of KTF, and to create a monopoly for KTF.

91.    Lee Thayer ("Mr. Thayer"), NYSDOT SMCI, responded to a complaint by KTF against Voyager 2, a TLC operator and KTF competitor.  Mr. Thayer issued Voyager 2 a $10,000 fine at JFK Terminal 4.  Mr. Thayer has no jurisdiction to issue summonses at JFK Airport, nor to any TLC governed vehicle *anywhere*.

92.    Voyager 2 appealed the fine issued by Mr. Thayer, and so far has reduced the fine to $2000, with this amount pending a full reduction.

93.    After the Defendants learned that ETS would be operating for Amigo, the NYSDOT began scrutinizing the operations of ETS, issuing $82,000 in fines.

94.    Upon information and belief, the NYSDOT has not recently investigated or fined any similar operator that is not a direct competitor of KTF.

95.    When Amigo complained to Mr. Thayer that KTF was operating illegally at JFK, Mr. Thayer did not travel to JFK, nor did Mr. Thayer fine KTF, which was subsequently removed from JFK by the Port Authority Police and by JetBlue for operating illegally.

96.    In an email chain that included NYSDOT Judge Alicia McNally ("Judge McNally"), Mr, Thayer offered to drive from Queens, N.Y. to Albany N.Y, to testify at the

protest hearing brought by KTF against Amigo.  This demonstrates bias in favor of KTF and against Amigo.

97.    At the time of the telephone conference discussed above, Amigo had already entered into a transportation subcontract with ETS Airport Shuttle Inc. ("**ETS**"), which already had both a DOT Number and a Port Authority Airline Arranged Permit of its own.  Additionally, ETS has a separate contract with JetBlue to transport commercial airline employees between airports in the New York metropolitan area (e.g., between JFK and Newark Airport), and it fulfills those contracts using 14-passenger vehicles, not including driver, covered with 1.5MM of General Liability insurance coverage.

98.    Upon information and belief, all of the transportation companies at JFK and all other Port Authority airports using 14-passenger vehicles, not including driver, have 1.5MM of General Liability insurance coverage.

99.    During the same conference call, Defendant Fisher stated that to receive an Airline Arranged Permit, Captain Connery would have to sign an affidavit holding the Port Authority harmless, an admission of guilt and not required by other permittees.  Defendant Fisher also complained to Captain Connery that she was upset that he had contacted the Port Authority Board of Directors to complain about her and Defendant Khella.  These comments made by Defendant Fisher were meant to intimidate and pressure JetBlue into acting negatively against Captain Connery and Amigo.

100.    Pursuant to the conference call with the Port Authority, JetBlue sent correspondence to Amigo advising that it was imposing additional requirements upon Amigo, including the requirement to obtain a minimum 5MM  auto-insurance policy.  Up until this point, there was never any requirement to obtain so much insurance coverage imposed by either the

Port Authority or JetBlue for a 14-passenger vehicle, not including driver. Defendant Warner-Dooley, Defendant Fisher, and Defendant Khella knew that KTF could obtain a minimum 5MM auto-insurance policy for a 24-passenger vehicle, not including driver, and that Amigo could not for a 14-passenger vehicle, not including driver, given that no company would over-insure a smaller vehicle.

101.    On or about February 2nd, 2021, Amigo filed a request for a DOT Number.

102.    On or about August 11th, 2021Defendant Contumelio filed a protest against the issuance of a DOT Number in favor of Amigo.

103.    Defendant Contumelio protested that KTF had ceased operations because of Captain Connery's false complaints to the Port Authority about KTF.  However, during sworn testimony at two successive DOT protest hearings, Defendant Contumelio testified that KTF had ceased operations because the Port Authority had issued the wrong permit, a claim that Ms. James refuted under oath.

104.    In her written protest, prior to the protest hearing, Defendant Contumelio slandered Captain Connery by making defamatory statements about his career as Captain at JetBlue, claiming that he was responsible for injuring 22 passengers, when the National Transportation Safety Board (NTSB) and JetBlue ruled that he had not.

105.    In her written protest, prior to the protest hearing, Defendant Contumelio slandered Captain Connery by stating that his status as a Federal Flight Deck Officer (FFDO), deputized by the U.S. Department of Homeland Security to prevent airline piracy by using a government-issued service weapon, had been revoked, which it has never been.

106.    Upon information and belief, Ms. James was identified as a testifying witness in the protest hearing.

107.    Upon information and belief, Defendant Fisher attempted to influence the protest hearing even though the Port Authority was not a party to the proceeding.

108.    Upon information and belief, Defendant Fisher had ex parte communications with Defendant Contumelio prior to the protest hearing.

109.    During the protest hearing, the attorney for Defendant Contumelio asked Ms. James if she was aware that Defendant Contumelio had been having frequent conversations with Defendant Fisher prior to the protest hearing. This question confirms the ex parte communications between Defendant Contumelio and Defendant Fisher prior to the protest hearing, and was asked to intimidate Ms. James into mitigating her testimony against the Defendants.

110.    Defendant Fisher never contacted Captain Connery to afford him the same opportunity, in defiance of the concept of "fairness" purportedly adhered to by  Defendant Warner-Dooley, Defendant Fisher, and Defendant Khella.

111.    Upon information and belief, Defendant Fisher had ex parte communications with the Department of Transportation in an effort to block or delay the issuance of a DOT Number to Amigo.

112.    The last DOT protest hearing concerning this matter was December 17, 2021. Nearly one year later, Judge McNally has not yet rendered a decision despite Defendant Contumelio contradicting her protest claiming that Captain Connery's false accusations were the reason she was shut down by the Port Authority.  Instead, Defendant Contumelio testified that her reason for not operating was an incorrect permit issued by the Port Authority.

113.    In an e-mail to Captain Connery, Defendant Fisher admitted that she had contacted the DOT to check the status of the protest hearing.  This has never been done by the

Port Authority, is outside the jurisdiction of the Port Authority, and demonstrates a partial interest by Defendant Warner-Dooley, Defendant Fisher, and Defendant Khella to injure Amigo and to assist KTF.

114.    Upon information and belief, Defendant Fisher interfered with Ms. James' ability to provide testimony at the DOT protest hearing, falsely stating to Judge Alicia McNally that Ms. James was unavailable to testify, when in fact Ms. James was waiting to be contacted by Defendant Fisher.

115.    Upon information and belief, Defendant Fisher was accused by Daniel M. Bach, the attorney representing Amigo in the DOT protest hearing, of coaching Mr. Sussman, a potential witness named by Defendant Contumelio, in a series of emails to Judge Alicia McNally and other interested parties.

116.    On information and belief, Mr. Sussman began lobbying Defendant Fisher to request that the Port Authority "sponsor" KTF so it could acquire an Airline Arranged Permit to lawfully access all Terminals at JFK, when KTF had already operated unlawfully without a permit and had done so for at least ten (10) months.

117.    Upon information and belief, Defendant Warner-Dooley, Defendant Fisher, and Defendant Khella had actual knowledge that Amigo intended to use 14-passenger vehicles, and that obtaining a minimum 5MM auto-insurance liability policy would be impossible and would prohibit Amigo from operating.

118.    Upon information and belief, the Port Authority has no legal right to control or influence "congestion" at JFK Terminal 5 Departures level, which is subject to the exclusive possessory rights of JetBlue, which leases JFK Terminal 5.

119.    Upon information and belief, the aforementioned activities violate the Port Authority's policies, practices and procedures against interference with competition between third-party service providers, including transportation services.

120.    Upon information and belief, with the exception of KTF, neither the Port Authority nor  Defendant Warner-Dooley, Defendant Fisher, or Defendant Khella has never assisted a third-party operator in obtaining airline sponsorship to operate a transportation company.

121.    Upon information and belief, with the exclusion of Amigo, neither the Port Authority nor Defendant Warner-Dooley, Defendant Fisher, or Defendant Khella has ever interfered with the airline sponsorship of a transportation company, nor with the issuance of any Port Authority permit that requires airline sponsorship.

122.    Upon information and belief, in 2021 all of the more than 500 transportation permits at JFK were issued using the Port Authority standardized and impartial procedure followed and administered by Ms. James, and without the involvement of, or interference by, Defendant Warner-Dooley, Defendant Fisher, or Defendant Khella.

123.    Upon information and belief, the decision to sponsor or not sponsor a transportation company for an Airline Arranged Permit lies within the absolute discretion of a commercial airline as stated in the proprietary lease.

124.    Upon information and belief, Defendant Warner-Dooley, Defendant Fisher, and Defendant Khella have effectively taken control of the JFK redevelopment project, insulating themselves as the only Port Authority representatives with detailed information and decision-making power concerning the project.  This places Defendant Warner-Dooley, Defendant Fisher, and Defendant Khella in a powerful position to pressure airlines party to the renovation.

125.    Upon information and belief, Defendant Khella's interference with JetBlue's sponsorship decisions was coercive, in that the Port Authority has the ability to impose severe costs, inconveniences, and construction delays at JFK Terminal 5 and all other terminals party to the massive renovation at JFK.

126.    Upon information and belief, Defendant Warner-Dooley, Defendant Fisher, and Defendant Khella are acting at the behest of one or more members of the Board of Directors of The Port Authority, given that the Board did not act on the complaint by Captain Connery against Defendant Fisher, Defendant Khella, and Defendant Contumelio.

127.    Upon information and belief, one or more board members of The Port Authority has a relationship with Defendant Contumelio, which provides motive for  Defendant Warner-Dooley, Defendant Fisher, and Defendant Khella to intercede on her behalf and to ensure that Defendant Contumelio is able to maximize her income by operating KTF as a transportation monopoly at JFK Terminal 4 and JFK Terminal 5.  Also, one or more board members have the ability to promote Defendant Warner-Dooley, Defendant Fisher, and Defendant Khella to higher positions within the Port Authority in exchange for their assistance with KTF.

128.    On information and belief, Defendant Warner-Dooley, Defendant Fisher, and Defendant Khella contacted JetBlue asking them to impose a minimum 5MM *auto-insurance* requirement, upon Amigo, knowing that no underwriter would provide said insurance for a 14-passenger vehicle, not including driver, and thus preventing Amigo from operating.

129.    Upon information and belief,  Defendant Warner-Dooley, Defendant Fisher, and Defendant Khella knew that it is impossible to obtain a  minimum 5MM insurance policy of any kind for a 14-passenger vehicle, not including driver, because that would render the vehicle

"over-insured" and would create an unacceptable risk of "moral hazard" for the insurance carrier providing such coverage.

130.    Captain Connery requested that JetBlue waive the requirement for a minimum 5MM *auto-insurance* insurance policy to cover Amigo's 14-passenger vehicles, not including driver, and to require only a minimum 1.5MM *auto-insurance* insurance policy per Port Authority requirements, but the request was not granted, despite this not being a requirement in the original JetBlue Letter of Permission provided to Amigo prior to interference by the Defendants

131.    KTF has been unlawfully operating without an appropriately processed and executed Airline Arranged Permit, without the required insurance coverage, and without paying required monthly Port Authority fees.

132.    KTF never complied with the requirements of the JetBlue License Agreement, including the requirements that KTF submit to JetBlue a copy of the appropriately processed and executed Port Authority Airline Arranged Permit, proof of required 5MM auto-insurance (not the 5MM General Liability policy required by the Port Authority), and ten (10) days of notice – all prior to commencing operations.

133.    Upon information and belief, Defendant Dooley, Defendant Fisher, and Defendant Khella are allowing KTF to operate with insurance less than the 5MM General Liability required by the Port Authority.

134.    Defendant Dooley, Defendant Fisher, and Defendant Khella, are allowing KTF to operate with a 2MM General Liability policy and a 5MM of auto-insurance policy, when a minimum 5MM General Liability insurance policy is required by the Port Authority for a vehicle with more than 14 seats, not including driver, under any circumstance.

135.    Per the Port Authority, no operator is allowed to operate at any JFK terminal Arrivals or Departures levels without at a minimum 5MM General Liability insurance policy while using a vehicle with more than 14 seats, not including driver.

136.    Upon information and belief, KTF has no proper permit, no proof of insurance.

137.    Upon information and belief, KTF has not paid the Port Authority the required permitting and operating fees.

138.    Upon information and belief, Port Authority is allowing KTF to "kite" its bills by opening two separate billing numbers for KTF (JFK Terminal 4 and JFK Terminal 5) in its computer system, and shuffling outstanding invoices from one account to another so that a bill is never generated, which it has not been since KTF resumed operating on April 15th, 2022.

139.    Ms. James negotiated a $21,000 payment that was paid to the Port Authority by KTF for unpaid fees resulting from illegal operations, after Defendant Contumelio informed Ms. James that KTF had transported approximately 250 passengers per day at $7.

140.    Defendant Warner-Dooley, Defendant Fisher, and Defendant Khella concocted an elaborate scheme to refund the $21,000 paid to the Port Authority by KTF.

141.    The $21,000 paid to the Port Authority by KTF was reduced to $8,000 by Defendant Warner-Dooley, Defendant Fisher, and Defendant Khella after they pushed Ms. James out of her job.  This was done by creating a $13,000 "credit" against both KTF accounts (JFK Terminal 4 and JFK Terminal 5), but KTF has not been billed since resuming operations on April 15, 2022.  If no bills are generated by year-end, this $13,000 "credit" will be refunded at the request of KTF.

142.    ETS, the contracted operator for Amigo, has expressed fear that Defendant Dooley, Defendant Fisher, and Defendant Khella will retaliate against other contracts and permits of ETS if it continues a business relationship with Amigo.

143.    In approximately 2018-2019, the Aviation Department at the Port Authority, the same department in which  Defendant Warner-Dooley, Defendant Fisher, and Defendant Khella work or worked at the initiation of the tortious act against Amigo, was found guilty during an internal investigation of stealing millions of dollars by rigging contracts.  Although  Defendant Warner-Dooley, Defendant Fisher, and Defendant Khella were ostensibly not involved, this establishes a pattern of illegal and unethical behavior within the Aviation Department at the Port Authority.

144.    In a fashion similar to Ms. James, the whistleblower in the previous matter was bullied, harassed, and ostracized by the Aviation Department.

145.    As a result of defendants' actions, described above, KTF has been unlawfully operating a monopoly for the transportation of commercial airline employees between JFK Terminal 4 and JFK Terminal 5 and Kew Gardens, New York, and Amigo has been unlawfully prevented from picking up and discharging passengers at JFK Terminal 4 and JFK Terminal 5 in furtherance of KTF's monopoly.

146.    Plaintiffs bring this action for unlawful restriction of trade under federal law and state law, including, without limitation, the Sherman Act of 1890, 15 U.S.C. §§ 1-2, the Clayton Act, 15 U.S.C. §4, the "Donnelly Act" (New York General Business Law §§ 340-347); tortious activity under New York law, including without limitation Tortious Interference With Contract, and Tortious Interference With Prospective Economic Advantage; and pursuant to any other cause(s) of action that can be established based upon the factual allegations set forth herein.

147.    Plaintiff seeks compensatory damages, treble damages, and punitive damages, as well as injunctive and declaratory relief, and such other relief as is just and proper, including appropriate equitable relief.

## FIRST CAUSE OF ACTION

## (Violation of the Sherman Act of 1890, 15 U.S.C. §§ 1-2)

*Against all Defendants*

148.    Plaintiffs hereby repeat and realleges each and every allegation in the foregoing paragraphs as if set forth fully herein.

149.    Defendants have entered into an unlawful agreement, combination or conspiracy to restrain trade or commerce and to afford KTF a monopoly on the transport of commercial airline employees between JFK Terminal 4 and JFK Terminal 5and destinations in New York and New Jersey.

150.    Defendants' unlawful agreement unreasonably restrains competition by prohibiting competitors, including Amigo, from accessing the market.

151.    Defendants' unlawful agreement, combination or conspiracy unreasonably restrains competition by dividing the market so that Amigo cannot compete to provide transportation to Delta and JetBlue employees arriving and departing from JFK Terminal 4 and JFK Terminal 5.

152.    Defendants' unlawful agreement, combination or conspiracy constitutes a *per se* violation of the Sherman Act of 1890, 15 U.S.C. §§ 1-2 (the "**Sherman Act**").

153.    As a direct and proximate result of Defendants' unlawful conduct in violation of the Sherman Act, Plaintiffs have suffered, and continue to suffer, monetary and/or economic

harm for which they are entitled to an award of monetary damages, treble damages, punitive damages, and other relief.

## SECOND CAUSE OF ACTION
### (Violation of the Clayton Act, 15 U.S.C. §4)

*Against all Defendants*

154.    Plaintiffs hereby repeat and realleges each and every allegation in the foregoing paragraphs as if set forth fully herein.

155.    Defendants have entered into an unlawful agreement, combination or conspiracy to restrain trade or commerce and to afford KTF a monopoly on the transport of commercial airline employees between JFK Terminal 4 and JFK Terminal 5 and destinations in New York and New Jersey.

156.    Defendants' unlawful agreement, combination or conspiracy unreasonably restrains competition by prohibiting competitors, including Amigo, from accessing the market.

157.    Defendants' unlawful agreement, combination or conspiracy unreasonably restrains competition by dividing the market so that Amigo cannot compete to provide transportation to Delta and JetBlue employees arriving and departing from JFK Terminal 4 and JFK Terminal 5.

158.    Defendants' unlawful agreement, combination or conspiracy constitutes a violation of the Clayton Act, 15 U.S.C. §4.

159.    As a direct and proximate result of Defendants' unlawful conduct in violation of the Clayton Act, Plaintiffs have suffered, and continue to suffer, monetary and/or economic harm for which they are entitled to an award of monetary damages, treble damages, punitive damages, and other relief.

**THIRD CAUSE OF ACTION**

**(Violation of New York General Business Law §§ 340-347 (the "Donnelly Act")**

*Against all Defendants*

160.    Plaintiffs hereby repeat and realleges each and every allegation in the foregoing paragraphs as if set forth fully herein.

161.    Defendants have entered into an unlawful agreement, combination or conspiracy to restrain trade or commerce and to afford KTF a monopoly on the transport of commercial airline employees between JFK Terminal 4 and JFK Terminal 5 and destinations in New York and New Jersey.

162.    Defendants' unlawful agreement, combination or conspiracy unreasonably restrains competition by prohibiting competitors, including Amigo, from accessing the market.

163.    Defendants' unlawful agreement, combination or conspiracy unreasonably restrains competition by dividing up territory so that Amigo cannot compete to provide transportation to Delta and JetBlue employees arriving and departing from JFK Terminal 4 and JFK Terminal 5.

164.    Defendants' unlawful agreement, combination or conspiracy constitutes a violation of New York General Business Law §§ 340-347 (the "**Donnelly Act**").

165.    As a direct and proximate result of Defendants' unlawful conduct in violation of the Donnelly Act, Plaintiffs have suffered, and continue to suffer, monetary and/or economic harm for which they are entitled to an award of monetary damages, treble damages, punitive damages, and other relief.

## FOURTH CAUSE OF ACTION

(Tortious Interference With Contract in violation of New York Law)

*Against Defendants Port Authority, Warner-Dooley, Khella, and Fisher.*

166.     Plaintiffs hereby repeat and realleges each and every allegation in the foregoing paragraphs as if set forth fully herein.

167.     Amigo had a valid contract with JetBlue.

168.     Defendant Warner-Dooley, Defendant Khella, and Defendant Fisher had actual knowledge of Amigo's original contract with JetBlue.

169.     Defendant Warner-Dooley, Defendant Khella, and Defendant Fisher intentionally procured JetBlue's breach of the original contract with Amigo through their actions of contacting JetBlue's Mr. Costello and Lisa Reifer, as set forth herein.

170.     Defendant Warner-Dooley, Defendant Khella, and Defendant Fischer intentionally interfered with Amigo's ability to perform under the original JetBlue contract by unlawfully interfering with and frustrating Amigo's receipt of an Airline Arranged Permit, by unlawfully attempting to subject Amigo to the Pilot Project, by interfering and frustrating with Amigo's receipt of a DOT Number, and by unlawfully imposing unnecessary insurance obligations and other performance obligations on Amigo, all as set forth above.

171.     Captain Connery has suffered emotional duress and reputational damage among JetBlue employees, given that his assurances that Amigo would provide service have been negated by interference by the Defendants.

172.     Defendant Warner-Dooley, Defendant Khella, and Defendant Fisher made performance of the contractual obligations of both Amigo and JetBlue impossible through the actions set forth above.

173.    Defendant Warner-Dooley, Defendant Khella, and Defendant Fisher took the actions herein complained of while acting within the scope of their employment.

174.    Defendant Port Authority is vicariously liable for the activities of  Defendant Warner-Dooley, Defendant Khella, and Defendant Fisher under federal and state laws of agency, master-servant law, and under the doctrine of *respondeat superior*.

175.    As a direct and proximate result of Defendants' unlawful conduct in violation of New York's law against Tortious Interference with Contract, Plaintiffs have suffered, and continue to suffer, monetary and/or economic harm including lost revenues and lost profits, for which they are entitled to an award of monetary damages, punitive damages, and other relief.

## FIFTH CAUSE OF ACTION

(Tortious Interference With Contract in violation of New York Law)
*Against Defendants Port Authority, Warner-Dooley, Khella, and Fisher.*

176.    Plaintiffs hereby repeat and realleges each and every allegation in the foregoing paragraphs as if set forth fully herein.

177.    Plaintiffs had valuable economic prospects as a result of the original contract between Amigo and JetBlue.

178.    Defendant Warner-Dooley, Defendant Khella, Defendant Fisher had actual knowledge of Amigo's original contract with JetBlue.

179.    Warner-Dooley, Defendant Khella, and Defendant Fisher intentionally procured JetBlue's breach of the original contract with Amigo through their actions of contacting JetBlue's Mr. Costello and Ms. Reifer, as set forth herein.

180.    Because of interference by  Defendant Warner-Dooley, Defendant Fisher, and Defendant Khella, JetBlue breached its original contract with Amigo, which did not require

insurance greater than the Port Authority standard 1.5MM General Liability insurance policy for 14-passenger vehicles, not including driver.

181.    Because of interference by Defendant Warner-Dooley, Defendant Fisher, and Defendant Khella, JetBlue  has imposed an excessive and unobtainable auto-insurance requirement of a minimum 5MM for a 14-passenger vehicle, when JetBlue currently has agreements and contracts with companies such as ACS, Desert Coach, and ETS, all of which use 14-passsenger vehicles with a 1.5MM General Liability insurance policy.

182.    Because of interference by Defendant Warner-Dooley, Defendant Fisher, and Defendant Khella, JetBlue breached its original contract with Amigo, causing Amigo to suffer damages including lost passenger revenue and lost profits.

183.    Defendant Warner-Dooley, Defendant Khella, and Defendant Fisher intentionally interfered with Amigo's ability to perform under the original JetBlue contract by unlawfully interfering with and frustrating Amigo's receipt of an Airline Arranged Permit, by unlawfully attempting to subject Amigo to the Pilot Project, by interfering and frustrating with Amigo's receipt of a DOT Number, and by unlawfully imposing unnecessary insurance obligations and other performance obligations on Amigo, all as set forth above.

184.    Defendant Warner-Dooley, Defendant Khella, and Defendant Fisher made performance of the contractual obligations of both Amigo and JetBlue impossible through the actions set forth above.

185.    Defendant Warner-Dooley, Defendant Khella, and Defendant Fisher undertook the actions complained of herein for the purpose of harming Plaintiffs.

186.    The actions of Defendant Warner-Dooley, Defendant Khella, and Defendant Fisher were wrongful and improper independent of the interference caused thereby, because they

violated federal and state antitrust laws, including the Sherman Act, the Clayton Act, and the Donnelly Act, as set forth herein.

187.    Defendant Warner-Dooley, Defendant Khella, and Defendant Fisher took the actions herein complained of while acting within the scope of their employment.

188.    By drafting, negotiating, and executing contracts on behalf of KTF, Defendant Warner-Dooley, Defendant Khella, and Defendant Fisher are effectively business partners with KTF, in violation of Port Authority compliance, ethics, and impartiality policies.

189.    Defendant Port Authority is vicariously liable for the activities of  Defendant Warner-Dooley, Defendant Khella, and Defendant Fisher under federal and state laws of agency, master-servant law, and under the doctrine of *respondeat superior*.

190.    As a direct and proximate result of Defendants' unlawful conduct in violation of New York's law against Tortious Interference with Prospective Economic Advantage, Plaintiffs have suffered, and continue to suffer, monetary and/or economic harm including lost revenues and lost profits, for which they are entitled to an award of monetary damages, punitive damages, and other relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays that the Court enter judgment in their favor and against Defendants, consisting of, *inter alia*, the following relief:

A. A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States and the State of New York;

B. An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for all monetary and/or economic damages, including, but not limited to, the loss of past and future income, wages, revenues, profits, and other benefits of operating a transportation business servicing JFK Terminal 4 and JFK Terminal 5.

D. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for all non-monetary and/or compensatory damages;

E.      An award of treble damages.

F.      An award of punitive damages;

G. An award of costs that Plaintiffs have incurred in this action, as well as Plaintiffs' reasonable attorneys' fees to the fullest extent permitted by law; and

H. Such other and further relief as the Court may deem just and proper.

Dated:          December 7, 2022
                Garden City, New York

                                Respectfully Submitted,
                                VALLI KANE & VAGNINI LLP

                                */s/ Matthew L. Berman*
                                Matthew L. Berman, Esq.

                                *Attorneys for Plaintiff*
                                600 Old Country Road, Suite 519
                                Garden City, New York 11530
                                516-203-7180